## CARTER ET AL. VS. CANTRELL ET AL.

Where the personal property of the wife is not reduced to possession by her husband during the lifetime of the wife, upon her death, it descends to her heirs or representatives, and not to her husband. *Cox et al. vs. Morrow*, 14 *Ark.* 617.

Disabilities, which bring a party within the exceptions of the statute of limitations, cannot be multiplied: as where, at the time of the accrual of the cause of action, the party entitled was a female infant, she cannot, after that disability is removed, set up coverture to avoid the statute bar.

If the wife be entitled to personal property, and a sufficient time has elapsed for the statute of limitations to constitute a bar to a recovery, the coverture of the wife will not avoid the statute in a suit by the husband and wife—it could only do so in a suit by the wife after the death of the husband.

*Appeal from the Circuit Court of Jefferson County in Chancery.*

Hon. SHELTON WATSON, Circuit Judge.

FOWLER, for the appellants.

PIKE & CUMMINS, for the appellees. We are really at a loss to know on what ground this suit was brought. It seems, from the allegations of the bill, to have been imagined that where a specific legacy is made to a woman, during her coverture, and she dies before her husband has reduced the legacy into actual possession, leaving him surviving, the legacy belongs not to *him*, but to her heirs or representative. And, if that *be* the ground, it is one as strikingly erroneous as any position we ever knew assumed. *Whitaker vs. Whitaker*, 6 *J. R.* 117; *McQueen on Husband and Wife* 19, 22, 46, 47 ; *Milner vs. Milner*, 3 *T. R.* 627; *Commonwealth vs. Manly*, 12 *Pick.* 175 ; *Halbrook vs. Waters*, 19 *Pick.* 354 ; *Wheeler vs. Bowen*, 20 *ib.* 563 ; *Fitch vs. Ayer*, 2 *Conn.* 143 ; *Griswald vs. Penniman*, *ib.* 564 ; *Hayward vs.*

*Hayward, id.* 517 ; *Schuyler vs. Hoyle,* 5 *J. C. R.* 206 ; *Hass-good vs. Houghton,* 22 *Pick.* 484; *Wallace vs. Taliaferro,* 2 *Call* 447 ; *Woelper's Appeal,* 2 *Barr* 72 ; *Caxton vs. Exers. of Haig,* 4 *Dessau.* 343; *Dald vs. Geiger,* 2 *Grattan* 102; *Lowry vs. Houston,* 3 *Howard Miss. Rep.; Stewart vs. Stewart,* 7 *J. C. R.* 244 ; 2 *Dev.* 260 ; 14 *Conn.* 102 ; 1 *Munf.* 98,; 5 *Sm. & Marsh.* 772; *Yerby vs. Lynch,* 3 *Grattan* 469, 488 ; 6 *Har. & John.* 31 ; 1 *Har. & Gill* 88 ; *Lasseter vs. Turner,* 1 *Yerg.* 414 ; *Bowman vs. Tucker,* 3 *Humph.* 648 ; *Brown vs. Brown, ib.* 128 ; *Pattie vs. Hall,* 2 *B. Mon.* 462 ; 12 *ib.* 42 ; 10 *ib.* 412.

Moreover, the statute of limitations of Tennessee was three years when this right accrued. The only disability in the complainants, at the time, was *infancy.* No subsequent disability could be added. 6 *J. C. R.* 360 ; 3 *J. C. R.* 129 ; 17 *Pet.* 37; 7 *Mon.* 59 ; 17 *Verm.* 165 ; 2 *Brock.* 436; 9 *Dana* 391 ; 4 *Yerg.* 232 ; 258 ; 7 *Monr.* 59 ; 3 *Conn.* 227 ; 12 *Wend.* 602 ; 1 *Pennsylvania* 6.

Their mother *died* about February, 1816, and of course they must all have been of age in February, 1837. The negroes remained in Tennessee more than three years after that.

The running of the statute of limitation confers an absolute right on the possessor. *Calvert use &c. vs. Lowell,* 5 *Eng.* 151 ; *Shelby vs. Grey,* 6 *Con. R.* 350 ; *Newby vs. Blakey,* 3 *Hen. & Munf.* 57 ; *Brent vs. Chapman,* 5 *Cranch* 358 ; *Hardeson vs. Hays,* 4 *Yerg.* 507 ; 3 *J. J. Marsh.* 363 ; 5 *Munf.* 435 ; 3 *Call* 362.

Both D. W., Landon D. Carter, and James D. Rea, are barred. The whole of complainants are barred for this reason. *Mrs. Rea* has no right at all in the negro, unless she survives her husband. He alone has the absolute life estate. If she survives, of course, the statute would not affect her. Now it does affect the husband, who has the only present interest. And this position the foregoing authorities prove. 1 *Dev.* 321 ; 10 *Ohio,* 11, 135; *Litt. Sel. Cas.* 296; 294; 5 *Day* 211; 4 *Day* 265, 310, all show that where several are interested in property, and one is barred, all are so.

Certainly this is so as to those not under disability. 7 *Cranch.* 156; 2 *Brock.* 436.

Mr. Justice WALKER delivered the opinion of the Court.

This is a suit in chancery, brought by the complainants, as heirs of Matilda M. Carter, to recover certain slaves and their hire.

The bill charges, that on the 5th of November, 1814, in Tennessee, Susanna Wendell, by will, devised to her daughter, Matilda M. Carter, a negro girl named Harriet. That the testatrix died in 1816, and her daughter, Matilda M. Carter, within a few weeks thereafter, without having reduced the negro Harriet to possession, and without any knowledge of the bequest. That Robert Searcy, the executor, proved the will, but his health being bad, he delivered the girl Harriet to Stephen Cantrell, as his agent, or in trust for the owners, or in some trust and fiduciary character. That although Matilda M. was, at the time of the bequest, the wife of Alfred M. Carter, (father of the complainants) the property in the slave never vested in him, but remained in the wife, and, at her death, passed directly to the complainants, her heirs. That Harriet was the mother of a family of children of much value; that she and her children have been kept in the employment of defendants, and that their hire is of great value. That complainants were at the death of their mother, infants, and resided more than three hundred miles from Nashville, the residence of their grand-mother, Mrs. Wendell, and of defendants, who thus became possessed of the property. That defendants always knew of complainants' rights, but fraudulently concealed from them the fact that they had any title or claim to the slaves, and that complainants never had any knowledge of their rights until shortly before their suit was brought. The bill was filed on the 13th of February, 1851.

The defendants answer, and admit the execution and validity of the will. That the complainants are the children and heirs of Matilda M. Carter, to whom the girl Harriet was bequeathed. That

they were infants, at the death of their mother, and resided in Carter county, Tennessee, some three hundred miles from Nashville, the residence of Mrs. Wendell, and of defendants.

But they positively deny all fraud or concealment, and all knowledge of complainants' rights, or that under the will, they ever had any rights, or that the slave Harriet ever came to the hands of them, or either of them, in trust for the owners, or others. But, on the contrary, assert, that the slave Harriet, was the property of the father of complainants, that he did reduce her to possession, and sold her for the valuable consideration of $500, to Stephen Cantrell, on the 11th of November, 1819, and exhibit a bill of sale of that date for Harriet; and also a letter written by the father, (Alfred M. Carter) as early as the 23d of March, 1817, from which it appears that he had been informed of the bequests, and had received from Stephen Cantrell a proposition to buy Harriet.

The answers then set up a chain of title through several persons to the defendant, G. M. D. Cantrell, in 1840 or 1841, and that as the slaves, from 1819 to 1832, were held in the State of Tennessee adversely by Stephen Cantrell, all the parties then being residents of Tennessee, and from 1832 to 1842, still in said State, by G. M. D. Cantrell and others, and from 1842 until the 13th of February, 1851, the time when this suit was brought, in Arkansas. The defendants set up, and insist upon the statute of limitations in bar of the complainants' right of action.

After a careful examination of the allegations and the evidence on both sides, the questions at issue are, substantially, but two.

*First.* Did the title to the girl Harriet, upon the death of Mrs. Matilda M. Carter vest in Alfred M. Carter, her husband, or did it descend to her children, the complainants?

*Second.* If the title to the slave did pass to the complainants, (her children) have they lost their right of action by the statute bar of limitation?

In proceeding to the investigation of the first point, it may suffice to say, that there is no doubt, from the allegations, the ad-

missions of answers, and the proofs, but that Mrs. Wendell made a valid bequest of the slave to Mrs. Carter, which took effect a very short time before her death. There is no positive evidence of the time when Mrs. Wendell died. The testimony of the witnes Thomas Washington, who was an old and intimate friend of Mrs. Wendell, comes nearest fixing the time; and, from his statement, it was in the winter of 1816, and but for the allegation that she died a few weeks before Mrs. Carter died, it would be a question of some doubt which of them died first. Mrs. Carter, as it is clearly shown, died on the 4th February, 1816, and it is highly probable, from all the circumstances in evidence, that she was not, at that time, aware of the death of Mrs. Wendell, or of the bequest of the slave. They resided something more than three hundred miles from each other, and at a time when comparatively but few facilities for communication were afforded; nor is there any evidence, nor do the facts tend to raise any presumption that Alfred M. Carter, her husband, was, at the time of her death, aware of the bequest in favor of his wife. The first knowledge of that fact, traced to him, was a letter from him to Stephen Cantrell, dated 23d March, 1817, in which he alludes to a proposition from Stephen Cantrell to him to purchase the girl. This letter pre-supposes a communication from Cantrell to him, on the subject of the purchase of the girl, but when it was made, does not appear, nor is it a matter of importance, from the view which we take of the case, whether he was so informed before or after his wife's death; because, if his title to the slave was perfect under his marital rights, from the time his wife took under the will, without reducing her to actual possession before the death of his wife, then such legal title would draw with it the right of possession, and he could reclaim the property, or dispose of it by sale, without reducing it to possession, and this brings up the precise question now to be considered. Because it is not pretended that he ever did reduce the girl into actual possession, at any time, unless it was formally at the time of his conveyance to Stephen Cantrell, which was some three years after the death of his wife.

The question is one of much difficulty, and there are not wanting highly respectable authorities, which would seem to sustain the validity of the husband's title to the personal property belonging to the wife, but which he did not, until after her death, reduce to actual possession.

Upon a careful examination of them, however, it will be found that these decisions were for the most part, made in cases where the wife had a clear legal title to the property, which, although not reduced to possession during the life time of the wife, was nevertheless not held under any adverse claim, and being subject to immediate possession, or held by one as bailee, or agent for the husband and wife, it became rather a question of fact, as to whether the property was, in effect, not in the possession of the husband although no acts of ownership had been asserted by him.

It is, however, unnecessary to refer particularly to them, because most of them were cited and relied upon by the counsel in the case of *Cox vs. Morrow*, and were carefully examined by the court, at the time that opinion was delivered, and the additional authorities gotten up with much care by the counsel for the appellee, are not stronger, or more favorable to the doctrine for which they contend, than those heretofore examined.

The right of the husband to the property of the wife, by the common law, is founded upon duties and liabilities incurred by the marriage or growing out of it.    He is tenant by courtesy of the wife's real estate, after the birth of a living child, because he is chargeable with the care, education, and support of the child. And he acquires a title to the personal property of the wife, because, upon his marriage, he, with other responsibilities, becomes liable for the payment of her debts.    As regards the tenancy, that survives the death of the wife, because the charge to maintain the child is not removed by her death : but after the death of the wife, as the husband is relieved from all liability to pay the debts contracted by her before marriage, there ceases to be any reason why he should recover the property, but there is a manifest reason why he should not do so : which is, that if there are debts

160          CASES IN THE SUPREME COURT

Carter et al, vs. Cantrell et al.          [JANUARY

still unpaid at the wife's death, the property should go to her administrator, to be applied to their payment, and the surplus, if any, to her heirs, which in the absence of any statute in Tennessee giving the property a different direction, would pass to her children, the complainants. Such, in effect, was the decision of this court in *Cox et al. vs. Morrow,* 14 *Ark. Rep.* 617.

It is true, in that case, that Mrs. Morrow held a life estate in the slaves, which had not terminated until after Mrs. Williams, who held the remainder, died; and, therefore, in that case neither the husband or the wife had either the possession, or the right of possession at the death of Mrs. Williams; but the grounds upon which the decision was made, went to deny the right of the husband to any personal property of the wife, not reduced to possession by him before her death. This question, as to what is, or is not an actual possession of the husband, must necessarily depend upon the circumstances of each particular case. If this property had been in the possession of the wife, or of any one under her, at the time of the marriage, there is but little doubt that the title, by virtue of the marriage, would have passed to him without any formal delivery or actual exercise of ownership. In that case, the possession of the wife would be the possession of the husband also, but where the wife has a legal title to the property, whether acquired before or after marriage, but has never reduced the property to possession, unless it is done by the husband, before the death of the wife, he can never do so afterwards, because the considerations which come into existence with the marriage, and conferred the right to recover and appropriate the property, ceased to exist at her death.

In the case now under consideration, if it had been shown that the executor of the will of Mrs. Wendell had delivered this property to Mrs. Carter, or to her husband, or to any one for them, before the death of Mrs. Carter, we would not say that this would not be sufficient, because a delivery to the wife, or to any one for her, would be a delivery to the husband.

Such, we have seen, was not the case here. There is no evi-

dence that this slave ever came to the hands of the executor until after Mrs. Carter's death, and even if she had, Mrs. Carter, if living, could not have recovered the slave from the executor, until the debts were paid, or at least until time had elapsed for their payment, because she takes the bequest under the will, subject to the payment of the debts, and the whole estate of the testator passes to the executor, in the first instance, for that purpose.

In *Refeld ex. vs. Billette*, 14 *Ark. Rep*. 158, this precise question came up, and it was there held, that the right of the legatee to his legacy, is suspended until by the assent of the executor, or the lapse of time for the settlement of the estate, the suspension is removed. Indeed, this principle has gone further, and it has been held that even where the slave bequeathed was, at the time the bequest took effect, in the possession of the legatee, the executor might recover hire for the period of one year after the grant of letters testamentary, he having until that time to examine into and settle the estate. *King vs. Cooper*, *Walker Miss. R*. 389.

Mrs. Carter therefore had, at the time of her death, neither the possession, nor the right to possession, and of course her husband, who could only succeed to her rights by marriage relations, had not. Entertaining these views of the rights acquired to the slave, under the will of Mrs. Wendell, it follows, that upon the death of Mrs. Carter, her children, the complainants, succeeded to the rights of the mother, as heirs of her estate, and unless barred by lapse of time from asserting their title, must recover the slaves; the proof, in all respects, being clearly sufficient to establish their right to the slaves and to their reasonable hire.

The claim was of more than thirty years standing, and was clearly barred by the statute of Tennessee, where the right accrued, and where the parties and the property remained for more than twenty years; and also, by the statute of Arkansas, where the property, and one of the defendants have been since the year 1842.

The complainants admit this, but contend that their right to recover, is not affected by the statute. *First*. Because, by the

fraud and concealment of the defendants, complainants were kept ignorant of their right of action until within about one year next before the time of bringing their suit. And *Second*, Because they were infants when their mother died, and when the right of action accrued, and one of the complainants contends, that before she was twenty - one years of age, and consequently, before the statute commenced running, she married, and continued in coverture up to the commencement of this suit.

Upon the first ground, (the fraud) it is very true, that complainants were, at the death of their mother, too young to understand, or to protect their rights; and that they resided at too great a distance from their uncle, Stephen Cantrell, and their cousin, G. M. D. Cantrell, to be presumed to know much of their property, or of the title by which it was held. But there is no evidence that either of the defendants, by any means whatever, misrepresented or concealed any facts touching complainants' title from them; but, on the contrary, it is abundantly proven that Stephen Cantrell did communicate the fact of the bequest of this slave to Alfred M. Carter, the father and natural guardian of these complainants; and it is equally well proven that their father sold the girl Harriet to Stephen Cantrell, and received a compensation in cash for her, and although Alfred M. Carter had no right to the slave, not having reduced her to possession during the life time of Mrs. Carter, it is quite probable, under all the circumstances, that the sale was made in good faith, believing, at the time, he had title to the property ; and it is more than probable, that Stephen Cantrell thought the property Carter's, or he never would have given five hundred dollars for a girl 12 or 14 years of age, which was a fair price for a sound title.

It may have been the misfortune of these defendants, never to have heard of their title, but as far as individual responsibility is concerned, their father, who lived until about the year 1850, is more chargeable with concealment than any one else. But the truth is, that the evidence of their title was matter of record, and as no effort was made to lull them to repose, and prevent them

from making the necessary examination, it was their misfortune that their residence was so remote, or that they had not been made acquainted with their rights under the will, and not attributable to fraud on the part of the defendants. This view of the question of fraud is fully sustained by the Supreme Court of Tennessee, in *Haynie vs. Hall's ex.*, 5 *Humph. Rep.* 293.

As between the executor, Searcy, and legatees, there was no doubt an express trust, under which this negro was held, and if this suit had been againt Searcy, the executor, there is authority for holding that the statute would not run to bar a recovery against him, at least until after he had ceased to act as executor, or until, by an assertion of title adverse to the legatee, he had betrayed his trust. But this suit is not against Searcy the executor, but Cantrell, who, conceding that he acquired title to the slave under him, would only have been responsible upon an implied trust. Such was expressly held to be the law in *Haynie vs. Hall ex.*, in which case the court said:

"The executor of Elijah Humphrie's will was an express trustee, but when Jesse Haynie received the money from the executor, *he* was placed in a very different relation to complainants, from that in which the executor stood. The law to be sure would turn him into a trustee, but he did not become so by contract, but was such by implication of law, because of his wrongful possession of money, which did not belong to him; nevertheless, he held it in his own right, and for his own benefit, adversely to the complainants."

Such being the nature of the trust, if indeed, there could be said to be any trust in this case, it is such as against which the statute bar may be pleaded. The remaining objection to the statute bar is, that they are exempt from its operation, on account of infancy, and as to one of them, also coverture.

The statute did not commence running during the life of Mrs. Carter, because under the decision of this court in *Refeld vs. Bellette*, the right of action did not accrue against the executor of the will for this bequest until after the payment of debts,

or the settlement of the estate, and consequently, as the complainants were infants at the time of her death, they were clearly within the saving clause of the statute, in favor of infants, *feme coverts*, &c. The youngest of the complainants was born some eight or ten days before the death of his mother, which took place the 4th February, 1816. He was, therefore, of age about the last of January, 1837, and of course his brother and sister, who were older than himself, were, before that time, of age. From that time, therefore, the statute commenced running as to all of them, unless the marriage of the sister may serve to protect her rights, of which we will presently consider : at all events, it commenced as to the two brothers. And the rule is, that when a statute commences running, that it runs out, notwithstanding a change of residence or subsequent intervening disabilities. The removal of the slaves to Arkansas, could, in no respect, change the result, or if it could, their right of action was clearly barred after the removal to Arkansas in 1842, and before the bringing of the suit in 1851.

The last question to be considered, relates to the effect of the statute upon the rights of the complainant, Elizabeth, and her husband, James D. Rea. It is alleged, and we think sustained by the evidence, that she was under the age of twenty-one years when she married, and the question is, as she was an infant when the cause of action accrued, and continued to be such until after her marriage, and up to the commencement of this suit, did the statute bar her right of action ; and if not, can she assert it during her coverture, in conjunction with her husband, after the time at which the bar would have attached against her, if she had remained unmarried, or shall she wait until her disability is removed by discoverture ?

It has been held upon high authority, that disabilities, which bring the plaintiff within the exceptions of the statute, cannot be multiplied or piled one upon another, but the party claiming the benefit of the exception, can only avail himself of the disability existing when the right of action accrued. *Mercer vs. Mercer*, 1 *How. U. S. Rep.* 37.

And although there is a conflict of opinions of several of the courts upon this point, our statute (*Dig. ch.* 99, *sec.* 28,) is conclusive upon the question in this State. In that section, it is provided, that "No person shall avail himself of any disability in this act mentioned, unless such disability existed at the time the right of action accrued."

Under this statute and the authority above cited, which is sustained by the general current of decisions; inasmuch as coverture was not one of the disabilities, under which Mrs. Rea rested at the time the cause of action accrued, she cannot avail herself of it to avoid the statute bar.

To the reverse of this, is the case of *Crozier vs. Gano and Wife*, 1 *Bibb* 260. The court in that case, when considering the sufficiency of a replication, which set up that defence against the statute bar, said: "The evident design of the replication is to show that the plaintiff, Keziah, from the time her cause of action first accrued, had, at all times, until within five years next before the commencement of the suit, labored under the disabilities of either infancy, coverture, or absence from the country, so as to bring her within the savings of the statute of limitations. If the replication had really shown this, it would have been good, for although one of them (as infancy for example,) had been removed, yet if another of them accrued, as marriage, before the removal of that of infancy, and so on in succession, so that all were not removed at any one time, whereby the statute could attach and begin to run, it would have been a sufficient answer to the plea: this the replication has not done."

Such was also the decision of the same court, in the case of *South's heirs vs. Thomas' heirs*, 4 *Mon.* 60. And in *Neal vs. Robertson et al.*, 2 *Dana* 88, the same rule is stated and approved, but the court held in that case, that notwithstanding the rights of the wife are protected by the continuing disability of infancy and coverture, yet she can only avail herself of it after discoverture, and that neither the husband alone, nor jointly with the

wife, can take the benefit of the proviso, which was intended for her benefit alone during coverture.

After quoting the saving clause of the Kentucky statute, which is substantially like our own, the court says: "There is nothing in the language which does, of itself, constitute a saving in favor of the husband, so as to prevent his being barred. If there be such saving, it must result from the general principles of the law, in order the better to secure and preserve the rights of the wife. We are not aware of any principle that will so operate. It may be, that the interest of the wife would, in some cases, be promoted by a recovery in the life time of the husband, thereby precluding the hazard of the loss of her right, by the loss of the evidence of it. But that is a description of interest not expressly protected by the words of the act, and the hazard referred to may be sufficiently guarded against by a bill perpetuating the testimony. The saving was not intended to guard his interest against the effect of his own laches, but to save hers, so far as they were separate, and disconnected from his. We do not perceive wherein their interests are so intimately blended, as indispensably, or even necessarily, to require an enforcement of her rights in his life time. Their interests are so far divisible, that he can maintain a suit in his own name alone for the land, and can by his separate deed alienate during their joint lives: so where a recovery is had in a suit brought by both, it is still for his sole benefit during his life. As then, the recovery is for his sole benefit, and as his separate alienation bars a recovery, on a demise in the names of both, no good reason is perceived why he should be permitted to avail himself of the saving in favor of the wife, to protect him against the effect of laches in this, more than in any other description of case."

So that giving the complainants the full benefit of these decisions, and leaving out of question the limitation act of December, 1846, limiting the right of action to recover slaves, in which there is no saving clause in favor of any one, and with regard to which we have intentionally declined to express any opinion in this case,

because the counsel have not thought proper to rely upon it, and because the subject is now before the court for determination, it is evident that the right of action would be barred. Because, if the reasons for denying the defendant to recover real estate by joining with his wife, in which he would have but a life estate by courtesy, were sufficiently strong in that case: the same reasons will apply, with increased force, in a suit like this for personal property, because he, in the event of a recovery, gets not a life estate, but an absolute title to the property. It is, therefore, in fact, his suit, prosecuted to recover property for himself under cover of the wife's disability to sue.

He rested under no disability to sue from the time of his marriage, until the statute bar would have attached, if his wife had remained single, and if he suffered the time to elapse for bringing suit without doing so, he must, like other suitors, abide the consequences.

So that in any point of view in which this subject may be considered, whether considering the lapse of time in Tennessee or in Arkansas, and with all the advantages of the saving clause in our general statute, in favor of infants, *feme coverts*, &c., or the decisions of the courts of Kentucky, which allow continued disabilities in case there is no intervening time between disabilities, so that the statute may begin to run, to protect the rights of the *feme covert*, this complainant, as well as all the others, was clearly barred by the statute of limitation.

We are, therefore, of opinion that the Circuit Court did not err in decreeing that the complainants' bill be dismissed with costs. Let the decree be affirmed.